**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA ANGELATOS,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 4:04-2033** |
| v. | : | **(JONES, D.J.)** |
| | | **(MANNION, M.J.)** |
| **US FOODS SERVICE, INC., BEVACO DIVISION,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

Pending before the court is the defendant's motion for summary judgment. (Doc. No. 25). Based upon the court's review of the record in this case, it is recommended that the defendant's motion be granted.

On September 15, 2004, the plaintiff filed the instant action alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. §621, et seq., the American's with Disabilities Act, ("ADA"), 42 U.S.C. §12101, et seq., and the Pennsylvania Human Relations Act, ("PHRA"), 43 P.S. §955(a). (Doc. No. 1).

On April 10, 2006, the defendant filed a motion for summary judgment, (Doc. No. 25), along with a supporting brief, (Doc. No. 26), a statement of material facts, (Doc. No. 27), and exhibits, (Doc. No. 28). The plaintiff filed an opposing brief with exhibits on May 9, 2006. (Doc. No. 31). A reply brief was filed by the defendant on May 30, 2006. (Doc. No. 34).

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted). Material facts are

those which will effect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the evidence or make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. Id.

According to the plaintiff's complaint, she was hired as a Territory Manager by the defendant on March 4, 1997. To this extent, she was to undertake various responsibilities, including the development of a new sales territory in the Pocono Region of the Commonwealth of Pennsylvania and the northern area of the State of New Jersey.

The plaintiff alleges that she continued to develop a new territory from the date of her hire through June 5, 1997. During that time, the plaintiff alleges that she developed 21 new accounts for the defendant.

On June 5, 1997, the plaintiff was injured when she slipped and fell at the Mr. Z's Market in Tobyhanna, Pennsylvania. As a result of her injuries, the plaintiff alleges that she suffered a period of total disability from June 5, 1997, through September 2, 1997.

According to the complaint, in June 1997, the plaintiff attempted to work

from home.  On September 2, 1997, the plaintiff alleges that she was released for limited duty work, which included a weight restriction of lifting no more than 25 pounds.  Although she reported for work on that date, the plaintiff alleges that the defendant refused to accommodate her employment restrictions.  According to the plaintiff, she was informed that there was no work available for her and that her territory had been eliminated.  The plaintiff alleges that her territory was not eliminated, but assigned to another employee, Mike Lazo, a male, who was approximately 30 years old at the time of the plaintiff's discharge.

The plaintiff claims that her termination constitutes discrimination based upon her age and gender. In addition, she claims that her discharge constitutes unlawful discrimination on account of being regarded as having an impairment.

In an attempt to pierce the allegations of the plaintiff's complaint and establish that there are no genuine issues of fact for trial, the defendant has submitted a statement of material facts to which the plaintiff has responded. The following facts are not in dispute[1]:

On or about March 5, 1997, the plaintiff began a period of employment with the defendant as an at-will employee.  The defendant communicated the employment offer on March 3, 1997, to the plaintiff by way of an offer letter,

---

[1]As set forth above, the court views the facts in a light most favorable to the non-moving plaintiff.

4

which stated that the plaintiff's sales goal by "June 1997 is to be at $10,000 per week at 10% gross profit; by September 1997 $17,500 per week" and went on through March 1998 to detail the plaintiff's sales goals.  The plaintiff was employed from March 5, 1997, through September 2, 1997, as a Territory Manager at the rate of $400 per week.

The plaintiff's duties as a Territory Manager included:

> Compiles lists of prospective customers for use as sales leads.
>
> Travels throughout assigned territory to call on regular and prospective customers to solicit orders and develop new accounts.
>
> Displays or demonstrates product, using samples or catalog, and emphasizes salable features.
>
> Quotes prices and credit terms and prepares sales contracts for orders obtained.
>
> Estimates date of delivery to customer, based on knowledge delivery schedules.
>
> Prepares reports of business transactions and keep records of accounts.

The plaintiff has testified that additional job duties included delivery of items to customers on an as needed basis, and lifting and carrying items weighing up to 50 pounds.

On June 5, 1997, the plaintiff was injured when she slipped at Mr. Z's

Market[2]. On June 19, 1997, the plaintiff received a Notice of Compensation Payable indicating that she was entitled to workers' compensation benefits because of her injury. During the time that the plaintiff was on workers' compensation leave, she was permitted to work from home, with another employee, Andi Silfin, assigned to assist her with managing her customer accounts by phone.

On June 19, 1997, Dr. Ricardo Nieves, who was retained by the defendant's workers' compensation insurance company, opined that the plaintiff's injuries from the June 5, 1997, incident had resolved.

On July 7, 1997, May Robinson, R.N., a case manager for CRA Managed Care, Inc., the workers' compensation insurance carrier for the defendant, prepared a report summarizing the plaintiff's records, which reads, in part:

> TREATING PHYSICIAN CONTACT:
> - Arranged evaluation of client with Dr. Scinico[3] at Northeastern Medical Center on 07-02-97.
> - Physician reports diagnoses of thoracic/lumbar sprain with left leg symptoms.
> - Prognosis is reported as good for recovery.

---

[2]The defendant indicates that the plaintiff was acting in her personal capacity while at Mr. Z's, while the plaintiff states that she was at the store for reasons related to her employment. The court notes that a Workers' Compensation Judge found that the plaintiff's injury occurred in the course and scope of her employment and the plaintiff received workers' compensation benefits for a period of time.

[3]Dr. Scinico was also retained by the workers' compensation insurance carrier for the defendant.

- Treatment plan consists of Ultram 3-4 times per day, Naprosyn 2 times per day, Chloroxozene at bedtime, physical therapy for 4 weeks and EMG of lower extremities.
- Vocational potential is modified duty at present with anticipated release to full duty in 3-4 weeks.

\* \* \*

RECOMMENDATIONS/GOALS:
- Prognosis good for full recovery in approximately 4 weeks.
- Physical therapy projected for 4 weeks by physician.
- Return to full duty projected for August 11, 1997.

On July 14, 1997, the plaintiff wrote a letter to Bill Renfer, her supervisor, expressing her appreciation for her continued pay despite "only doing about 1/3 of what [she] was doing prior to [her] injury. . ." She further indicated that Ms. Silfin had been a "great help" and that she had "actually been doing most of the work . . ."[4]

Dr. Mark Scinico issued a notice and Physician's Affidavit of Recovery to the defendant that the plaintiff has fully recovered and could return to work without limitation on August 27, 1997. On the same date, Dr. Scinico provided a Physician Capabilities Check List, which indicated that the plaintiff was fully recovered and could return to work without restrictions.

---

[4] The plaintiff denies this statement in part, but does not indicate to what extent she denies the statement. The plaintiff's letter to Mr. Renfer is included in the defendant's exhibits.

In her deposition testimony, the plaintiff alleges that the following comments were made by Mr. Renfer, her supervisor, which were sexually harassing:

> Q. And is that what you mean by sexist comments?
>
> A. No, no, that was an action that, to me, I was not part of it. I got penalized. I actually got in trouble for not being present. They said I was supposed to be present. Well, how was I supposed to be present if you didn't give me a ride there. I couldn't drive there. I did ask for it. I'm talking about when they would say to me, "Great job, Pat," and he was good for that, Mr. Renfer, "Great job, Pat, you keep up the good work because one of these days you'll be up here with us big boys." To me, that's a sexist remark. I don't want to be up there with the big boys.
>
> Q. Mr. Renfer said that to you?
>
> A. Yes.
>
> Q. Do you recall when he made that comment?
>
> A. It was many times, and it should be documented; it was many times. Yes, I did mention that to Lisa, and she laughed. They thought it was funny. "Oh, You don't know, Bill, that's just how he talks."
>
> Q. Let's take a step back. On how many occasions did Mr. Renfer make that comment to you?
>
> A. Maybe two times in a really meaningful way.
>
> Q. So he on two occasions said . . .
>
> A. One time, he wrote it; I think he wrote it.

8

> Q. Do you know when he wrote it?
>
> A. No. Like I said, it should be there.
>
> Q. So he made the comments verbally on two occasions and you are stating that he wrote it on one other occasion.
>
> A. Um-hum.
>
> Q. Other than those three occasions, did Mr. Renfer make any comments like that?
>
> A. Well, he would say to me, "You're in a man's field, a man's position," you know, things like that, and I'd say, "No, it's not. Who told you it's a man's job?"

The plaintiff further testified as follows:

> A. You keep saying two (2) statements, and I am saying there were a lot of statements but I don't remember at this time what the statements are. Those two (2) I remember very clearly.
>
> \* \* \*
>
> A. Okay, I remember another remark. There was a remark made because of the guys that are on the docks. I had to take the food off the thing. He (Renfer) said, "Wow, look at this. Look at the muscles. Now you are getting manly muscles."

The plaintiff testified that some of the remarks were made to her in the presence of Ms. Silfin.

On August 27, 1997, Allison Davis, the Director of Human Resources for the defendant, sent the plaintiff a letter stating that USFS had received the Physician's Affidavit of Recovery indicating that she could return to work

9

without limitation and that USFS anticipated her return to work on September 2, 1997.

As of June 5, 1997, the date of the plaintiff's injury, the plaintiff had opened 21 new accounts and had a weekly sales average of $3,093.20. Testimony indicates that the Pocono Region had periods of seasonality at the end of summer before ski season and in the spring. From approximately June 5, 1997, through July 18, 1997, the plaintiff's accounts were handled by the plaintiff from home with the assistance of Andi Silfin by telephone. On or about July 14, 1997, the plaintiff suggested that her accounts be transferred to someone who could service the customers in-person[5]. Specifically, by correspondence dated July 14, 1997, the plaintiff wrote a letter to her supervisor, Mr. Renfer, which reads in relevant part:

> I went over my weekly reports, I see my sales have drop (sic) so much since I gotten hurt, I just hope we don't start losing the accounts al-together for Hickory Valley. They want me or another salesperson to show up in person at 4:00 a.m. every Monday morning for the order. They say that if we can't they will not deal with us any longer. So if you want to turn this account and Mt. Bethel Diner, Billy's Pocono Diner and any other account of mine to another salesperson, I will understand. I'd rather we don't lose the accounts.

By July 18, 1997, the plaintiff's average sales were $1,770.28, and she

---

[5]The plaintiff testified that she anticipated that the turnover would be on a temporary basis.

had six active customers[6].

In late July 1997, the plaintiff's remaining accounts were transferred to Mike Lazo.

In late 1997, JP Food Service acquired USFS[7]. The defendant's materials provide that, although the acquisition by JP Food Service did not directly result in changes and/or reductions to the sales staff, the corporate change did impact USFS's decision-making process in that "another sister company within 60 miles" would be present and it was anticipated that there would be "several overlapping areas of coverage."

When questioned about the decision to terminate[8] the plaintiff, USFS Human Resources Director Allison Davis testified as follows:

> Q. Do you remember the reason that was given to her why she wasn't going to be allowed to come back to work?
>
> A. I don't remember Craig's exact words.

---

[6]Although the plaintiff denies this statement, in her correspondence dated July 14, 1997, she writes as follows: "I'm writing you this letter to let you know that I appreciate so much that you continue to pay me my full salary. Even when I'm only doing about 1/3 of what I was doing prior to my injury." She further admitted that, prior to her injury, she had opened twenty-one accounts and had a weekly sales average of $3,093.20.

[7]Although the plaintiff denies this statement, she indicates ". . . that the acquisition was delayed until at least December 23, 1997."

[8]Although the defendant uses the term "lay off" intermittently to describe the plaintiff's separation from the company, it is clear from the record that the plaintiff was terminated.

> Q. Do you remember the substance of what was said?
>
> A. That we were in the process of a merger with J.P. Food Service. I recall there were three territory managers in the Poconos from J.P. Three from ours. Declining sales in Pat's territory. And this decision was made to lay Pat off due to a lack of work.

Ms. Davis further testified as follows:

> Q. Okay. Do you know, was Ms. Angelatos' territory [e]liminated?
>
> A. I know that there was a lack of accounts in that territory. That's a hard question for us because what I may consider a territory – again, on the human resource side. Usually a territory consists fo 35-40 accounts.
>
> Q. Uh-huh (yes).
>
> A. And the territory manager will call on – that's what I call a territory. Would I call somebody just trying to develop a territory with six account? That's hard for me to explain unless you can give me a little more insight into that.

With respect to the plaintiff's termination, USFS stated in its Position Statement to the PHRC that:

> During this period of time USF was also in the process of a merger with JP Foodservice. JP Foodservice currently had 3 Territory Managers in the Pocono regions, as well as USP had 3 Territory Managers covering outlying areas close to the Poconos. It was decided that because of the lack of business in Complainants previous territory, the remaining accounts would stay with Mike Lazo.
> As a result on September 2, 1997, a business decision was made to lay off Complainant due to the lack of business in her territory.

12

Based upon the above facts, the defendant has brought the instant motion seeking summary judgment with respect to all of the plaintiff's claims[9].

In analyzing a claim for employment discrimination, the court applies the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff bears the burden of establishing a prima facie case of discrimination. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant meets its burden of production, the plaintiff must prove, by a preponderance of the evidence, that the defendant's proffered reason was a pretext for discrimination. Id. at 802; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993).

To establish a prima facie case of gender discrimination, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her position; and (3) she suffered an adverse employment action or was discharged "under conditions that give rise to an inference of unlawful discrimination." Geraci v. Moddy-Tottrup, Int'l Inc., 82 F.3d 578, 580 (3d Cir. 1996)(quoting Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

---

[9]Although the plaintiff indicates that the defendant is seeking summary judgment on all claims, except the PHRA claim, the defendant indicates in a footnote that the plaintiff's PHRA claim should also be dismissed. However, because the PHRA claim is derivative of the gender, age, and disability discrimination claims, the defendant did not reargue the point.

To establish a prima facie case of age discrimination, the plaintiff must show that (1) she is forty or older; (2) she is qualified for the position in question; (3) she suffered an adverse employment decision; and (4) she was replaced by a sufficiently young person or sufficiently younger persons were treated more favorably so as to create an inference of discrimination. Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995).

Assuming the plaintiff has established a prima facie case for gender and age discrimination,[10] the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

The defendant proffers that the plaintiff's employment was terminated because she was hired to develop a territory in the Pocono and Northern New Jersey Regions. The plaintiff's offer of employment, which the plaintiff agreed to, provided that her sales goal by "June 1997 [was] to be at $10,000 per week at 10% gross profit; by September 1997 $17,500 per week" and went on through March 1998 to detail the plaintiff's sales goals. By June 5, 1997, the plaintiff had opened 21 new accounts with an approximate average of $3,802.20 per week, while her sales goal was at least $10,000 per week. By July 18, 1997, the plaintiff's average sales were approximately $1,770.28 per week with only 6 active accounts. In addition, the defendant proffers that the impending acquisition by JP Foodservice caused USFS to recognize that it

---

[10]The parties dispute this point.

would have a surplus of territory managers in the Pocono region. As a result of the plaintiff's failure to meet her sales goals and the surplusage of territory managers due to the merger, the defendant proffers that it made a business decision to terminate the plaintiff and have her remaining accounts absorbed into another territory.

The defendant has proffered legitimate, nondiscriminatory reasons for the plaintiff's termination. It has, therefore, met its "relatively light burden." Fuentes, 32 F.3d at 763. As such, the analysis proceeds to step three. To survive summary judgment when an employer articulates legitimate, nondiscriminatory reasons for its action, ". . . the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764. This is a "difficult burden" for the plaintiff to meet. Id. at 765. The plaintiff cannot rely on speculation as to the employer's motives, she must bring forth evidence of such specific " . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons." Id. (citations omitted).

In this case, despite the plaintiff's claims that her employment was

terminated as the result of gender and age discrimination, in her brief in opposition to the defendant's motion, the plaintiff indicates that "the real reason for her termination was the fact that she had suffered a work-related injury and had an ongoing limitation. (Pl App I – Dep Angelatos, page 63). Defendant did not want to take Plaintiff back and risk a further workers' compensation claim." Thus, by the plaintiff's own account, the "real reason" for her termination had nothing to do with either her gender or age.

Moreover, the plaintiff's attempt to establish that the defendant's proffered reasons were pretextual is unavailing. Specifically, with respect to her gender discrimination claim, the plaintiff claims that, at the time of her hire, she provided Mr. Renfer a list of accounts she handled for her former employer. The plaintiff claims that she was asked to allow a three month period for the other territory managers, all males, to call upon the accounts.

In addition, the plaintiff points to the conduct of Mr. Renfer in making various comments, such as that she was trying to become a "big boy" in a "man's job," and that she was "getting manly muscles." The plaintiff claims that she reported these incidents to the Human Resource Department and that no action was taken.

Plaintiff next claims that she was the only female territory manager working for Mr. Renfer in 1997.

The plaintiff also claims that two individuals who had previously worked as territory managers for the defendant, Lee Eckert and Thomas Wasilewski,

testified that they had been given some existing accounts in order to assist them when they started, whereas she had not.

With respect to her age discrimination claim, the only point made by the plaintiff is that Mike Lazo, the individual to whom her accounts were given, was about ten years her junior.

Finally, to the extent that the defendant has argued that the plaintiff's failure to achieve her sales goals was a factor in her termination, the plaintiff argues that there is a seasonality to the region where she was assigned which contributed to her low sales rates.

Evening assuming the plaintiff's claims to be true, the plaintiff has still not met her burden of establishing that the defendant's stated reason for her termination is not believable and/or that an "invidious discriminatory reason was more likely than not the motivating or determinative cause" of USFS's action. Here, although the plaintiff argues that there is a seasonality to the region she was assigned, which accounted for her low sales, this factor was considered and included in the employment agreement, which the plaintiff reviewed and accepted. To this extent, the agreement states: "US FOODSERVICE/Bevaco understands the seasonality of your territory and will review your sales goals accordingly to trending sales numbers." With this, the plaintiff accepted the sales goals provided in the agreement. The plaintiff did not, however, come near to meeting those goals during the prescribed periods. Moreover, the plaintiff has presented no evidence to establish that

the merger with JP Foodservice did not effect overlapping territories and increase the number of territory managers in the Pocono Region. Therefore, the defendant's motion for summary judgment should be granted with respect to the plaintiff's gender and age discrimination claims.

With respect to the plaintiff's ADA claim, the defendant argues that the plaintiff has failed to establish a prima facie case of disability discrimination. (Doc. No. 26, pp. 13-15).

In order to make out a prima facie case under the ADA, the plaintiff must establish: (1) that she is a "disabled" person within the meaning of the ADA; (2) that she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that she has suffered an otherwise adverse employment decision as a result of discrimination. Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon 90 F. 3d 827, 831 (3d Cir. 1996)). See also Schriner v. Sysco Food Service of Central Pa., 2005 WL 1498497 (M.D.Pa.).

The ADA defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. §12102(2).

In this case, the plaintiff alleges that she was discriminated against "on account of being regarded as having an impairment." To this extent, the

18

plaintiff must establish that the defendant mistakenly believed that she had a condition which resulted in her being (1) unable to perform a major life activity that the average person in the general population can perform; or (2) "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. §1630.2(j)(3)(i).

The plaintiff has not established that the defendant mistakenly believed that she had an impairment which significantly restricted her ability to perform her job, let alone an entire class of jobs or a broad range of jobs in various classes. To this extent, as set forth above, the defendant had before it the opinion of Dr. Nieves, who opined on June 19, 1997, that the plaintiff's injuries from the June 5, 1997, incident had resolved. Moreover, the defendant received Dr. Scinico's notice and Physician's Affidavit of Recovery which reflected that the plaintiff fully recovered and could return to work without limitation on August 27, 1997. On the same date, Dr. Scinico provided a Physician Capabilities Check List to the defendant, which indicated that the plaintiff was fully recovered and could return to work without restrictions. Thus, the only information before the defendant prior to the plaintiff's termination[11] was that she could return to work without restriction. Therefore,

---

[11] The plaintiff refers to the report of Dr. Chhabria, her treating physician, who opined that she could return to work with limitations. This report was not completed until after her termination.

the defendant's motion for summary judgment should also be granted with respect to the plaintiff's ADA claim.

On the basis of the foregoing, **IT IS RECOMMENDED THAT:** the defendant's motion for summary judgment, **(Doc. No. 25)**, be **GRANTED**.

S/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:** December 27, 2006
O:\shared\REPORTS\2004 Reports\04-2033.01.wpd