IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA ANGELATOS,              :
                                 :
            Plaintiff,           :       CIVIL NO. 4:CV-04-2033
                                 :
      v.                         :       (Judge Jones)
                                 :
US FOODS SERVICE, INC.,          :
BEVACO DIVISION,                 :
                                 :
            Defendant.           :

## MEMORANDUM AND ORDER

### February 23, 2007

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Pending before this Court is a Motion for Summary Judgment ("the Motion"), filed by Defendant US Foods Service, Inc., Bevaco Division ("Defendant" or "USFS") on April 10, 2006. (Rec. Doc. 25). On December 27, 2006, the United States Magistrate Judge Malachy E. Mannion issued a Report recommending that Defendant's Motion be granted in its entirety. (Rec. Doc. 35). For the reasons that follow, we will adopt the learned Magistrate Judge's Report in part and reject it in part.

**PROCEDURAL HISTORY:**

On September 15, 2004, Plaintiff Patricia Angelatos ("Plaintiff" or

1

"Angelatos") filed a Complaint in the above-captioned action.  (Rec. Doc. 1).

On April 10, 2006, Defendant filed the instant Motion.  (Rec. Doc. 25).  On December 27, 2006, the Magistrate Judge issued a Report recommending that Defendant's Motion be granted.  (Rec. Doc. 35).  Plaintiff filed her Objections to Magistrate Judge Mannion's Report on January 11, 2007.  (Rec. Doc. 37).  Thus, this matter is ripe for disposition.

**FACTUAL BACKGROUND**:

In his Report and Recommendation ("Report"), Magistrate Judge Mannion summarizes the factual background supporting the instant action based upon his reading of the parties' submissions.  Although we agree with the majority of Magistrate Judge Mannion's factual summary, we disagree with a few specific portions thereof.  Accordingly, we will outline the facts surrounding this action, as we have found them for our purposes here, viewed in the light most favorable to the non-moving party, Plaintiff.

On March 3, 1997, USFS sent Angelatos a letter offering her employment as a Territory Manager.  (Rec. Doc. 28 at 29).  In that capacity, Angelatos was to develop a new sales territory in the Pocono Region of Pennsylvania and the northern area of New Jersey.  (Rec. Docs. 1, ¶ 11; 15, ¶ 11).  The March 3, 1997 letter indicated that Angelatos' sales goal by June 1997 was to achieve sales of

"$10,000 per week at 10% gross profit; [and] by September 1997 $17,500 per week . . . at 10% gross profit . . . ."  (Rec. Doc. 28 at 29).  On or about March 4, 1997, Angelatos signed the March 3, 1997 letter and was hired by USFS.  (Rec. Doc. 28 at 29).

Angelatos' duties as a Territory Manager included compiling lists of prospective customers, traveling throughout the assigned territory to call on regular and prospective customers, and servicing customers' accounts, including delivery of items to customers on an as needed basis, which could require lifting and carrying items weighing up to fifty (50) pounds.  (Rec. Doc. 35 at 5).  From the date of her hire until June 5, 1997, Angelatos acquired twenty-one (21) new accounts for USFS.  (Rec. Doc. 35 at 3).  Her weekly sales average was $3,093.20, well below the $10,000 sales goal outlined in the offer of employment letter.  (Rec. Doc. 35 at 10).  However, testimony indicates that the Pocono Region experienced periods of seasonality before the ski season and between the close of the ski season and the summer (doc. 35 at 10), and, indeed, the employment letter USFS sent Angelatos acknowledged as much: USFS "understands the seasonality of your territory and will review your sales goals accordingly [sic] to trending sales numbers"[1] (doc. 28 at 29).

---

[1] We have seen no evidence in the record of such trending sales numbers.

3

On June 5, 1997, Angelatos was injured when she slipped and fell at Mr. Z's Market in Tobyhanna, Pennsylvania.[2]  (Rec. Doc. 35 at 3).  On June 19, 1997, Angelatos received a Notice of Compensation Payable indicating that she was entitled to workers' compensation benefits as a result of her injury.  (Rec. Doc. 35 at 6).  During her workers' compensation leave, Angelatos was permitted to work from home, with assistance from another USFS employee, Andi Silfin ("Silfin"), assigned to help Angelatos manage her accounts by phone.  (Rec. Doc. 35 at 6).

While on workers' compensation leave, Angelatos was evaluated by several doctors retained by USFS' workers' compensation insurance company.  On June 19, 1997, Dr. Ricardo Nieves opined that Angelatos' injuries from the June 5, 1997 incident had resolved.  (Rec. Doc. 35 at 6).  However, on July 7, 1997, following an evaluation of Angelatos by Dr. Mark Scinicio, May Robinson, R.N., prepared a report summarizing Angelatos' records, which concluded that her prognosis was good for full recovery in approximately four (4) weeks and projected that full duty could be resumed on August 11, 1997.  (Rec. Doc. 35 at 6-7).

On July 14, 1997, Angelatos wrote her supervisor at USFS, Bill Renfer ("Renfer"), a letter expressing her appreciation for the continued pay despite "only

---

[2] USFS argues that Angelatos was acting in her personal capacity while at Mr. Z's, but Angelatos argues that she was acting in the course of employment.  (Rec. Doc. 35 at 6 n.2).  We note that a Workers' Compensation Judge found that Angelatos' injury occurred in the course and scope of her employment.  (Rec. Doc. 35 at 6 n.2).

doing about 1/3 of what [she] was doing prior to [her] injury . . . " and indicating

that Silfin had been a "great help" and "actually ha[d] been doing most of the work

. . . ."  (Rec. Doc. 28 at 43).  In this letter, Angelatos also expressed concern that

she and USFS could lose accounts as a result of her inability to service her

accounts in person.  (Rec. Doc. 28 at 43).  Indeed, she stated:

> I just hope we don't start losing the accounts al-together [sic].  For Hickory
> Valley they want me or another salesperson to show up in person at 4:00
> AM every Monday morning for the order.  They say that if we can't, they
> will not deal with us any longer.  So if you want to turn this account and Mt.
> Bethel Diner, Billy's Pocono Diner, and any other account of mine to
> another salesperson, I will understand.  I rather we don't lose the accounts
> . . .

(Rec. Doc. 28 at 44 (emphasis added)).

By July 18, 1997, Angelatos' average sales were $1,770.28 per week, and

she had six (6) active customers.[3]  (Rec. Doc. 35 at 11).  In late July 1997,

Angelatos' remaining accounts were transferred to Mike Lazo ("Lazo").  (Rec.

Doc. 35 at 11).  As of July 1997, Lazo was thirty-two (32) years old (doc. 31-3 at

101) and Angelatos was forty-one (41) years old (doc. 1, ¶ 4).

On August 20, 1997, Dr. Scinico issued a Physical Capabilities Check List

to USFS indicating potentially conflicting findings regarding Angelatos: he

---

[3] We note that although Angelatos denies this statement, her July 14, 1997 letter to
Renfer appears to confirm its veracity.  (See Rec. Doc. 28 at 43-44).

checked a box designating that she had fully recovered and could return to work with no restrictions, but he also commented that he "suggest[s] lumpers[4] although objectively able to do regular job." (Rec. Doc. 28 at 57). However, on August 27, 1997, Dr. Scinico provided a Physician's Affidavit of Recovery to USFS indicating that Angelatos had fully recovered and reiterating that she could return to work without limitation on same date. (Rec. Doc. 35 at 7).

Accordingly, on August 27, 1997, the Director of Human Resources for USFS, Allison Davis ("Davis"), sent Angelatos a letter stating that USFS had received Dr. Scinico's Physician's Affidavit of Recovery and that USFS anticipated her return to work on September 2, 1997. (Rec. Doc. 35 at 9-10).

On September 2, 1997, Angelatos apparently reported for work at USFS, but was told that she had been terminated. Davis testified that at the time of termination, Angelatos was told that the reasons therefor were that USFS was in the process of a merger with JP Food Service, and that overlapping territories of the two companies' Territory Managers in the relevant region, as well as the declining sales in Angelatos' territory, had led to the decision to terminate. (Rec. Doc. 35 at 11-12). However, Angelatos disputes Davis' testimony, noting that the

---

[4] For our purposes here, we accept Angelatos' assertion that the doctor's reference to "lumpers" means individuals assigned to help carry items. (Rec. Doc. 37 at 8).

Vice President of USFS, Lee Eckert ("Eckert") testified:

> Q:    In other words, there would be no reason that Pat Angelatos' job was
>       eliminated in September – on September 2, 1997 because of the
>       impending merger between – or acquisition of J.P. Food Service and
>       U.S. Food Service/Bevaco Division?
> A:    Not to my knowledge, no.
> Q:    Would you have been aware of that if such were the case?
> A:    I would think.

(Rec. Doc. 31-3 at 40).  Angelatos also notes (doc. 37 at 4) that in her deposition,

Davis contradicted her own testimony as to the reason for Angelatos' termination:

> Q:    And was anybody else laid off in 1997 other than Pat Angelatos?
> A:    I don't remember.
> Q:    Was her territory dissolved?
> A:    I don't remember that.

(Rec. Doc. 31-3 at 63).

In late 1997, JP Food Service acquired USFS.[5]

Although the record is not specific as to the timing thereof, in her deposition,

Angelatos testified that Renfer, her supervisor, allegedly made several sexually

harassing comments to her during her employ by USFS.  (Rec. Doc. 35 at 8).

Angelatos further testified that such comments were made many times, sometimes

in writing and sometimes orally, and that she could not remember all of the

statements or the dates on which they were made.  (Rec. Docs. 37-2 at 7; 31-3 at

---

[5] Angelatos denies this statement, but concedes the acquisition, stating that "the
acquisition was delayed until at least December 23, 1997."  (Rec. Doc. 31-4 at 7).

7).  Indeed, Angelatos' testimony repeatedly referred to documentation as to the exact comments and their timing, allegedly created when she brought her discrimination action, but such documentation does not appear to be in the record before us.

Nevertheless, by USFS' own admission, Angelatos' deposition testimony highlights at least three separate comments.  First, she alleges that Renfer made such statements as: "'Great job, Pat, you keep up the good work because one of these days you'll be up here with us big boys.'" (Rec. Doc. 27 at 4).  Second, she alleges that Renfer said, "You're in a man's field, a man's position." (Rec. Doc. 27 at 4).  Third, she alleges that when watching Angelatos unload food, Renfer said, "Wow, look at this.  Look at the muscles.  Now you are getting manly muscles." (Rec. Doc. 35 at 9).

Angelatos has also testified that she informed both the Human Resource Manager, Lisa Walsh, and Walsh's supervisor, Davis, of Renfer's comments and that no action was taken.  (Rec. Doc. 31-3 at 11).  Angelatos alleges that they laughed off Renfer's comments as jokes.  (Rec. Doc. 31-3 at 11).

In her objections to the Magistrate Judge's Report, Angelatos appears to argue that she also suffered gender discrimination soon after her hiring.  (Rec. Doc. 37 at 6).  First, Angelatos argues that the deposition testimony of Eckert and

Thomas Wasilewski ("Wasilewski"), originally a Territory Manager with USFS and currently a Regional Manager with USFS, demonstrates that male Territory Managers were regularly given existing accounts at the time of their hire, and Angelatos, a female, was not. (Rec. Doc. 37 at 6). Angelatos fails to identify a cite in the record indicating that she was not given existing accounts at the time of her hire, and, in fact, during at least one point in her deposition, Angelatos acknowledges that she was given at least one account. (Rec. Doc. 31-3 at 5).

However, Eckert and Wasilewski's testimony confirms Angelatos' allegation that they received accounts when they began work for USFS as Territory Managers. (Rec. Doc. 31-3 at 35, 72). In fact, even after an opportunity to confer with counsel following a question regarding whether Territory Managers ordinarily receive such accounts upon their hire, Wasilewski admitted:

> Through consulting with our vice president of sales, we try to traditionally put together a compensation package that will allow for the territory manager to obviously bring home income to support his family and give him certain criteria of periods of review so that we can analyze and make sure that the new territory manager is progressing enough to eventually be on a fully commission program.

(Rec. Doc. 31-3 at 77 (emphasis added)). Upon further questioning, Wasilewski indicated that such an approach, although not a policy of USFS, was consistent with the company's practice. (Rec. Doc. 31-3 at 77).

Second, Angelatos argues that at the time of her hire, she was even asked to

9

allow other USFS employees, males, to call upon those accounts she had

maintained for one of USFS' competitors.  (Rec. Doc. 37-2 at 6).  Angelatos'

deposition indicates that USFS explained this practice by saying that some of the

accounts Angelatos had brought with her from USFS' competitor had already been

called upon by USFS employees.  (Rec. Doc. 31-3 at 5).  Accordingly, USFS

decided that the accounts with established business with USFS would remain with

the USFS Territory Managers who had obtained the business, and those accounts

that had not yet given USFS any business, but had been "cold called" upon by

USFS Territory Managers, would remain accounts of those USFS Territory

Managers for a period of three (3) months to see if they could obtain an order for

USFS.  (Rec. Doc. 31-3 at 5).

## STANDARD OF REVIEW:

When objections are filed to a report of a magistrate judge, we make a de

novo determination of those portions of the report or specified proposed findings

or recommendations made by the magistrate judge to which there are objections.

See United States v. Raddatz, 447 U.S. 667 (1980); see also 28 U.S.C. §636(b)(1);

Local Rule 72.3l.  Furthermore, district judges have wide discretion as to how they

treat recommendations of a magistrate judge.  See id.  Indeed, in providing for a de

novo review determination rather than a de novo hearing, Congress intended to

permit whatever reliance a district judge, in the exercise of sound discretion,

chooses to place on a magistrate judge's proposed findings and recommendations.

See id., see also Mathews v. Weber, 423 U.S. 261, 275 (1976); Goney v. Clark,

749 F.2d 5, 7 (3d Cir. 1984).

**DISCUSSION**:

Plaintiff objects to the Magistrate Judge's recommendation that all of her

employment discrimination claims be dismissed.[6]  (Rec. Docs. 37-38).  Plaintiff

essentially argues that the Magistrate Judge made "determinations of facts which

are for the province of the jury and, further, that there are errors of law with regard

to the application of the applicable standards concerning the requisite elements of

proof required of Plaintiff" to support her claims.  (Rec. Doc. 37-2 at 2).  We will

consider the learned Magistrate Judge's recommendations, as well as Plaintiff's

objections, as to each of Plaintiff's claims in turn.

We initially note that the Magistrate Judge's Report accurately outlined the

appropriate legal standards as they apply to Plaintiff's discrimination claims and

that Plaintiff's objections to the Magistrate Judge's Report appear to involve the

---

[6] Defendant's Motion for Summary Judgment (doc. 25) requests dismissal of all claims and that Defendant's Brief in Support thereof (doc. 26 at 4 n.1) indicates that it did not reargue with respect to Plaintiff's Pennsylvania Human Relations Act ("PHRA") claims because they are derivative of the federal discrimination claims.  Thus, any contention by Plaintiff that Defendant seeks only dismissal of her federal discrimination claims is erroneous.

application of those principles rather than the principles themselves.  Thus, we will only briefly reiterate the applicable law here.

## A.    Plaintiff's Gender Discrimination Claims

When analyzing various employment discrimination claims, including Plaintiff's gender discrimination claims at issue here, courts are to apply the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under this framework, plaintiffs bear the initial burden of establishing a prima facie case of discrimination.  <u>Id.</u> at 802.  Upon such a showing, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action.  <u>Id.</u>  Following this articulation, the burden shifts back to plaintiffs to prove, by a preponderance of the evidence, that the defendant's proffered reason was only a pretext for discrimination.  <u>Id.</u> at 804.  <u>See also</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506-08.

To establish a prima facie case of gender discrimination, Plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for her position; and (3) she suffered an adverse employment action; (4) under circumstances that raise an inference of discriminatory action.  <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003).  Although the parties

12

disagreed about whether Angelatos established a prima facie case with respect to her Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., and PHRA, 43 P.S. § 955, gender discrimination claims, the Magistrate Judge assumed that she had.  On this record and given the posture of the case, we see no reason to challenge that assumption here.

The Magistrate Judge then went on to find that USFS articulated two legitimate, non-discriminatory reasons for her termination: her failure to reach the sales goals outlined in her offer of employment letter and the acquisition of USFS by JP Food Service, resulting in insufficient work in Angelatos' territory to sustain her employment.  (Rec. Doc. 35 at 14-15.  See also Rec. Doc. 26 at 7-8).  Plaintiff argues that such reasons are "legally insufficient to show a legitimate, non discriminatory [sic] reason to terminate" Angelatos.  (Rec. Doc. 37-2 at 11).  However, we agree with the Magistrate Judge's conclusion that by articulating these two reasons, USFS satisfied its "relatively light burden." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Thus, we are left to decide whether the Magistrate Judge properly concluded that Angelatos failed to respond with "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action."

Fuentes, 32 F.3d at 764.  Although admittedly this is a "difficult burden" for

plaintiffs to sustain, id. at 765, we respectfully disagree with the learned Magistrate

Judge's holding.  Rather, we hold that Angelatos' gender discrimination claims

should survive USFS' Motion for Summary Judgment on the grounds that she has

offered sufficient evidence that a reasonable factfinder could find USFS'

legitimate, non-discriminatory reasons only pretext.  We so hold primarily because

in light of Plaintiff's numerous allegations of gender discrimination, in the form of

Renfer's oral and written comments, as well as his failure to provide her existing

accounts to the extent that males may have been, the deposition testimony of

USFS' own representatives is disconcerting.  Moreover, and importantly, it creates

very real questions of fact as to Plaintiff's allegations of discrimination.

    We first note that the deposition testimony of some USFS representatives

could establish that attributing Angelatos' termination to the impending acquisition

of USFS by JP Food Services was pretext for gender discrimination.  Eckert

himself acknowledged that to his knowledge, Angelatos was not terminated

because of the JP Food Service acquisition, and that if such were the case, he

probably would have known.  (Rec. Doc. 31-3 at 40).  Moreover, at her deposition,

Davis contradicted her own testimony as to the cause of Angelatos' termination, at

one point conceding that she could not recall whether Angelatos' territory had been dissolved.  (Rec. Doc. 31-3 at 63).

We also note that the testimony of USFS representatives could undermine USFS' reliance on Angelatos' poor sales figures as a cause of her termination. First, if, as Eckert and Wasilewski testified, new Territory Managers were regularly given existing accounts (doc. 31-3 at 35, 72, 77), and if Angelatos did not receive such accounts to the same extent as male Territory Managers, then a reasonable factfinder could view USFS as partially responsible for Angelatos' poor sales prior to her June 5, 1997 fall.  Second, such a view could also result from the potential finding of a factfinder that USFS actually went so far as to take some of the accounts that Angelatos had brought with her, from one of USFS' competitors, away from Angelatos.  (Rec. Docs. 31-3 at 5, 37-2 at 6).

Finally, we note that we find unpersuasive USFS' argument that Angelatos' July 14, 1997 letter to Renfer waived any claim to her accounts.  Rather, we find that Angelatos' repeated references to "we" and "us," rather than just "USFS," indicate that she probably only intended to temporarily relinquish claim to these accounts.  (Rec. Doc. 28 at 44).  Thus, responsibility for USFS' permanent reassignment of those accounts to another Territory Manager, and the resulting further decline in Angelatos' sales figures, may not rest on Angelatos.

15

Accordingly, we will reject that portion of the learned Magistrate Judge's Report that recommends dismissal of Angelatos' gender discrimination claims under Title VII and the PHRA.  Her gender discrimination claims remain viable.

**B.    Plaintiff's Age Discrimination Claims**

When analyzing Plaintiff's Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and PHRA age discrimination claims, we again apply the McDonnell Douglas burden-shifting framework.  See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996) (noting "[w]e have never had occasion to decide whether that application of the Title VII rule [McDonnell Douglas framework] to the ADEA context is correct, but since the parties do not contest that point, we shall assume it.").

To establish a prima facie case of age discrimination, Plaintiff must show: 1) she is forty (40) years of age or older; 2) she is qualified for the position in question; 3) she suffered an adverse employment decision; and 4) she was replaced by a sufficiently young person or a sufficiently younger person was treated more favorably so as to create an inference of discrimination.  Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995).  As with Plaintiff's gender discrimination claims, the parties disagreed as to whether she put forth a prima facie case, but the Magistrate Judge assumed that she had.  Once again, on this

record and given the posture of the case, we see no reason to challenge that assumption here.

Thus, the burden shifted to USFS to articulate a legitimate, non-discriminatory reason for Angelatos' termination.  As indicated above, the Magistrate Judge found that USFS articulated two legitimate, non-discriminatory reasons for her termination: her failure to reach the sales goals outlined in her employment letter and the acquisition of USFS by JP Food Service, resulting in insufficient work in Angelatos' territory to sustain her employment.  (Rec. Doc. 35 at 14-15).  Again, we agree with the Magistrate Judge's conclusion that by articulating these two reasons, USFS satisfied its "relatively light burden." Fuentes, 32 F.3d at 763.

Angelatos has objected to the Magistrate Judge's finding that her age discrimination claims should be dismissed.  Thus, we re-examine de novo whether the Magistrate Judge properly concluded that Angelatos failed to respond with "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 764.

In her Objections to the Magistrate Judge's Report, the only age-related

17

argument upon which Angelatos relies to show pretext was that Mike Lazo was almost ten (10) years younger than Plaintiff at all relevant times to this action. (Rec. Doc. 37-2 at 12).  This sole allegation going to age discrimination, which provides no more information than that required to satisfy one of the elements of her prima facie case, contrasts sharply with the numerous circumstances that led us to conclude that Plaintiff's gender discrimination claims should survive summary judgment.  Thus, with respect to Plaintiff's age discrimination claim under the ADEA and the derivative PHRA claim, we find that Plaintiff has failed to sustain the "difficult burden," id. at 765, of showing Defendant's articulated legitimate, non-discriminatory reasons were merely pretext for age discrimination.

Accordingly, we will adopt that portion of the Magistrate Judge's report that dismisses Angelatos' age discrimination claims.

**C.     Plaintiff's Claims of Discrimination Based upon Disability**

To establish a prima facie case of discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., Plaintiff must show: 1) that she is "disabled" within the meaning thereof under the ADA; 2) that she is otherwise qualified to perform the essential functions of the job, either with or without reasonable accommodations; and 3) that she has suffered an adverse employment decision as a result of discrimination.  Gaul v. Lucent Technologies,

Inc., 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831

(3d Cir. 1996)).  The ADA defines "disability" as: 1) a physical or mental

impairment that substantially limits one or more of the major life activities of the

individual; 2) a record of such impairment; or 3) being regarded as having such an

impairment.  42 U.S.C. § 12102(2).

In the instant action, Plaintiff alleges discrimination "on account of being

regarded as having an impairment . . . ."  (Rec. Doc. 1, ¶ 23).  Within the context of

the ADA, "regarded as" having an impairment means:

> (1) Has a physical or mental impairment that does not substantially limit
> major life activities but is treated by a covered entity as constituting such
> limitation;
> (2) Has a physical or mental impairment that substantially limits major life
> activities only as a result of the attitudes of others toward such impairment;
> or
> (3) Has none of the impairment defined in paragraph (h)(1) or (2) of this
> section, but is treated by a covered entity as having a substantially limiting
> impairment.

29 C.F.R. § 1630.2(l).  Thus, as the Magistrate Judge noted, the definition of

"substantially limits" becomes critical; it means:

> (i) Unable to perform a major life activity that the average person in the
> general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under
> which an individual can perform a particular major life activity compared to
> the condition, manner, or duration under which the average person in the
> general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).  With respect to the major life activity of working, at issue

here, "substantially limits" means:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

Upon consideration of Plaintiff's ADA claim and derivative PHRA claim, the Magistrate Judge found that Plaintiff had not established a prima facie case as she had "not established that the defendant mistakenly believed that she had an impairment" because "the only information before the defendant prior to the plaintiff's termination was that she could return to work without restriction."  (Rec. Doc. 35 at 19).  Plaintiff's Objection to the Magistrate Judge's Report argues that at a minimum, a question of fact exists "with regard to what defendant had by way of medical information" at the time of Plaintiff's termination.  (Rec. Doc. 36 at 15).

Plaintiff correctly asserts that as of the date of her termination, USFS had conflicting reports from Dr. Scinico.  On August 20, 1997, Dr. Scinico issued a Physical Capabilities Check List commenting that he "suggest[s] lumpers although objectively able to do regular job" (doc. 28 at 57), but on August 27, 1997, he issued a Physician's Affidavit of Recovery indicating that Angelatos had fully

20

recovered and reiterating that she could return to work without limitation on same date (doc. 35 at 7).  Thus, the Report's finding that the report from Dr. Chhabria, Plaintiff's treating physician, dated after Plaintiff's termination, was the only document indicating that Plaintiff could return to work with restrictions (doc. 35 at 19 n.11) is erroneous.

However, even assuming that when it terminated Plaintiff, USFS was cognizant of Dr. Scinico's August 20, 1997 suggestion that Plaintiff be provided "lumpers," such is not sufficient to support a finding that USFS believed Plaintiff was "restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i).  Dr. Scinico's August 20, 1997 reference to "lumpers" is insufficient for a number of reasons.  First, in Dr. Scinico's August 20, 1997 Physical Capabilities Check List, he also indicated that although he suggested "lumpers," Plaintiff was "objectively able to do regular job."  (Rec. Doc. 28 at 57).  Second, and more significantly, even if Dr. Scinico's comments on the Physical Capabilities Check List dated August 20, 1997 were somewhat equivocal, his Physician's Affidavit of Recovery dated August 27, 1997 was not: it unequivocally indicated that Angelatos could return to work without limitation.  (Rec. Doc. 28 at 55).  Thus, the medical information that USFS

received in closest proximity to the date of Angelatos' termination was that she

could return to work without limitation, leading us to conclude that Plaintiff's

allegation that USFS regarded her as disabled on the date of her termination is not

supported on this record.

Accordingly, we will adopt that portion of the Magistrate Judge's Report

that concluded Plaintiff failed to put forth a prima facie case, albeit for different

reasons.  Plaintiff's ADA and PHRA claims for disability discrimination fail.

**NOW, THEREFORE, THE FOLLOWING ORDER IS ENTERED:**

1.   The Report (doc. 35) is **ADOPTED** in part and **REJECTED** in part,
     to the extent heretofore outlined.

2.   Defendant's Motion for Summary Judgment (doc. 25) is **GRANTED**
     in part and **DENIED** in part:

     a.   Defendant's Motion is **GRANTED** to the extent that Plaintiff's
          federal and state age and disability discrimination claims are
          dismissed.

     b.   Defendant's Motion is **DENIED** to the extent that Plaintiff's
          federal and state gender discrimination claims remain viable.

3.   A telephonic conference in this matter is hereby scheduled for March

     2, 2007, at 1:30 p.m., so that the parties and the Court may discuss

placement of this case on a trial term.   Plaintiff's counsel shall initiate

the conference call.  Chamber's telephone number is (570) 601-1497.


<u>s/ John E. Jones III</u>
John E. Jones III
United States District Judge